No. 21-1731

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

Pharmaceutical Research and Manufacturers of America,

*Plaintiff-Appellant,*

v.

Stuart Williams, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Minnesota
No. 0:20-cv-01497-DSD-DTS
Hon. David S. Doty, U.S. District Judge

**BRIEF OF THE NATIONAL ASSOCIATION OF MANUFACTURERS
AND THE CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

Jeremy C. Marwell
Matthew X. Etchemendy
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: (202) 639-6507
Email: jmarwell@velaw.com
Email: metchemendy@velaw.com

*Counsel for* Amici Curiae

*(Names and addresses of additional counsel appear inside cover.)*

May 28, 2021

Patrick Hedren
Erica Klenicki
Manufacturers' Center
  for Legal Action
733 Tenth Street, NW
Suite 700
Washington, DC  20001
Phone: (202) 637-3100

*Counsel for the National
Association of Manufacturers*

Tara S. Morrissey
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC  20062
Phone: (202) 463-5337

*Counsel for the Chamber of
Commerce of the United States of
America*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), *amici curiae* National Association of Manufacturers ("NAM") and Chamber of Commerce of the United States of America ("Chamber") make the following disclosures:

The NAM is a nonprofit trade association representing small and large manufacturers in every industrial sector and in all 50 states. The NAM has no parent corporation, and no publicly held company has 10% or greater ownership in the NAM.

The Chamber is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement ..................................................................i

Table Of Authorities ................................................................................ iii

Identity And Interest Of *Amici Curiae* ....................................................1

Introduction ..............................................................................................2

Argument ..................................................................................................6

    I.     The Act Is Unconstitutional Under The *Per Se* Takings Doctrine............6

        A.     The *Per Se* Takings Rule Is An Important Bulwark For Private Property Rights. ..................................................................6

        B.     The Act Is Flatly Unconstitutional Under *Horne*'s Bright-Line *Per Se* Takings Rule. ...........................................................10

    II.    The State's Rationale For Defending The Act Would Impermissibly Allow States To Take Private Property In A Broad Range Of Contexts. ................................................................................14

    III.    The District Court's Procedural Holding Was Wrong. ............................21

Conclusion ..............................................................................................26

Certificate Of Compliance .......................................................................27

Certificate Of Service .............................................................................28

# TABLE OF AUTHORITIES

**Cases:**  **Page(s)**

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012)..........................................................................7, 8

*Armstrong v. United States*,
364 U.S. 40 (1960)....................................................................... 13, 15

*Biotechnology Indus. Org. v. District of Columbia*,
496 F.3d 1362 (Fed. Cir. 2007) ...........................................................20

*Cherokee Nation v. S. Kan. Ry. Co.*,
135 U.S. 641 (1890)..................................................................... 12, 22

*E. Enters. v. Apfel*,
524 U.S. 498 (1998)..............................................................................8

*Haw. Housing Auth. v. Midkiff*,
467 U.S. 229 (1984).............................................................................12

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015).................................................................... passim

*Innovair Aviation, Ltd. v. United States*,
632 F.3d 1336 (Fed. Cir. 2011) ...........................................................15

*Innovair Aviation, Ltd. v. United States*,
72 Fed. Cl. 415 (2006) ........................................................................15

*Kelo v. City of New London*,
545 U.S. 469 (2005).............................................................................22

*Knick v. Twp. of Scott*,
139 S. Ct. 2162 (2019).................................................................. passim

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013).............................................................................12

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994)..............................................................................6

**Cases—Continued:**                                        Page(s)

*Lee v. City of Chicago*,
    330 F.3d 456 (7th Cir. 2003) ...............................................15

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)....................................... 7, 9, 14

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992).......................................7, 9

*Milwaukee & Suburban Transp. Corp. v. Milwaukee Cty.*,
    263 N.W.2d 503 (Wis. 1978)........................... 15, 17

*Nixon v. United States*,
    978 F.2d 1269 (D.C. Cir. 1992)....................... 16, 20

*Penn Cent. Transp. Co. v. New York City*,
    438 U.S. 104 (1978)...............................................8

*Se. Pa. Transp. Auth. v. Gilead Sci., Inc.*,
    102 F. Supp. 3d 688 (E.D. Pa. 2015).......................20

*Seery v. United States*,
    161 F. Supp. 395 (Ct. Cl. 1958).............................16

*Store Safe Redlands Assocs. v. United States*,
    35 Fed. Cl. 726 (1996) ..........................................13

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002)...............................................8

*United States v. Gen. Motors Corp.*,
    323 U.S. 373 (1945)....................................... 16, 23

*United States v. Russell*,
    80 U.S. 623 (1871)........................................ 16, 23

*Yee v. City of Escondido*,
    503 U.S. 519 (1992).................................... 8, 9, 13

**Constitutional Provisions:**

U.S. Const. amend. V.................................................3

**Constitutional Provisions—Continued:** Page(s)

U.S. Const. amend. XIV ........................................................................3

**Statutes:**

Minn. Stat. Ann. § 151.74.....................................................................2

**Rules:**

Fed. R. App. P. 29(a)(2)........................................................................1

Fed. R. App. P. 29(a)(4)(E)...................................................................1

**Other Authorities:**

Fiona M. Scott Morton, *The Problems of Price Controls*, Regulation, Spring
    2001, at 50, https://bit.ly/3i19Z4a........................................................19

Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules,*
    *and Inalienability: One View of the Cathedral*,
    85 Harv. L. Rev. 1089 (1972)..............................................................18

Jennifer Gish, *$200 State Grants for School Supplies*, Times Union (Aug.
    12, 2009), https://bit.ly/3kMQbDu ......................................................19

Michael W. McConnell, *The Raisin Case*,
    2015 Cato Sup. Ct. Rev. 313 (2015).....................................................18

Minn. Dep't of Human Servs., *Minnesota Food Assistance Program*
    *(MFAP)*, https://bit.ly/2EzTO06 ..........................................................19

Roscoe Pound, *Interpretations of Legal History*
    (Peter Smith 1967) (1923) ......................................................................6

Solar Energy Indus. Ass'n, *What Rebates and Incentives Are Available for*
    *Solar Energy?*, https://bit.ly/3mRhxu0................................................19

Steven N. Berger, Note, *Access for CATV Meets the Taking Clause: The Per*
    *Se Takings Rule of* Loretto v. Teleprompter Manhattan CATV Corp., 25
    Ariz. L. Rev. 689 (1983).........................................................................9

Susan Rose-Ackerman, *Against Ad Hocery: A Comment on Michelman*, 88
    Colum. L. Rev. 1697 (1988).............................................................9, 10

**Other Authorities—Continued:**                                      **Page(s)**

Truth in Accounting, *Financial State of the States 2020* (Sept. 22, 2020),
    https://bit.ly/2FOaFwR ......................................................................19

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The National Association of Manufacturers ("NAM") and the Chamber of Commerce of the United States of America ("Chamber") submit this brief in support of plaintiff-appellant, the Pharmaceutical Research and Manufacturers of America ("PhRMA"), and in support of reversal.[1]  The NAM is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states.  The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The Chamber is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief.  No person other than *amici curiae*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.  The parties have consented to the filing of this brief.  *See* Fed. R. App. P. 29(a)(2).

files *amicus curiae* briefs in cases that raise issues of concern to the nation's business community.

As preeminent national business and trade associations, the NAM and the Chamber have a strong interest in, and can offer a unique perspective on, the issues in this case. American businesses rely on stable, fair, and predictable property rules—including in the area of takings law. The District Court's decision threatens to upend that stability and to drive up manufacturing and litigation costs for American businesses. The perspective of the NAM and the Chamber will show the broader impacts on business and help inform the resolution of this case.

## INTRODUCTION

The Alec Smith Insulin Affordability Act ("Act") seeks to achieve a laudable policy goal of improving access to insulin. Minn. Stat. Ann. § 151.74. But it does so by unconstitutional means—ongoing, *per se* takings of PhRMA's members' personal property without just compensation. In addition, the legal theories on which the state has relied to defend its departure from existing black-letter law implicate personal property rights nationwide and raise issues of grave concern to manufacturers, businesses, and property owners of all kinds. The implications go well beyond the pharmaceutical industry. NAM and Chamber members— representing businesses in all sectors of the U.S. economy—have an interest in

preserving personal property rights and promoting economic development nationwide.

Private enterprise cannot flourish if government may take private property whenever and on whatever terms it pleases. The Constitution recognizes this by prohibiting the government from taking private property without paying "just compensation." U.S. Const. amends. V, XIV. Here, the Act imposes takings of the most straightforward kind: *per se* takings that require manufacturers to hand over, and give up all rights to, physical goods they designed, manufactured, and own—on penalty of severe and increasing penalties. *See* PhRMA Br. 8-12. At the same time, Minnesota has not only failed to provide for compensation in the Act, but insists it is not constitutionally required to do so. *See id.* at 16. That striking and doctrinally indefensible legal position, if accepted, would have severe negative consequences for personal property rights nationwide, including for businesses operating in every industry. Minnesota's effort to avoid clear Supreme Court precedent creates grave concerns for businesses across the country.

The District Court erred by holding that the owners of commercial goods must bring repeated and ongoing inverse condemnation actions to obtain compensation for these takings. This Court should reverse the District Court's flawed standing analysis, reach the constitutional question at the heart of this case, and hold that the Act effects *per se* physical takings without just compensation.

1.     The *per se* takings doctrine creates a clear, bright-line rule governing cases that fall within the heartland of takings law—the clarity of which stands in stark contrast to the *ad hoc*, circumstance-specific tests that courts apply when evaluating laws that fall short of *per se* takings.  The Supreme Court recently reaffirmed and clarified the *per se* takings rule in *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), a case involving a government program with striking (and legally dispositive) parallels to the Act.  Here, however, Minnesota has steadfastly resisted any concession that the Act imposes *per se* takings, even though it requires manufacturers to give up their personal property entirely and without any compensation.  The state's position is inconsistent with *Horne* and black-letter *per se* takings doctrine, which is dispositive here.  The clarity and rigor of the *per se* takings rule provides critical protection for all property owners, especially businesses that rely on clear property rights in investing in research and development and other economically beneficial activities; under *Horne*, that bright-line rule applies here.

2.     The *per se* takings doctrine prevents the kinds of negative legal and practical consequences for businesses, and especially manufacturers, that would otherwise occur under laws like the Act.  To be sure, the Act itself is concerned with a specific subject, *i.e.*, insulin.  But as decades of case law illustrate, government takings of personal property have not been limited to any particular subject matter

or industry, and history shows the importance of maintaining a clear and robust *per se* takings doctrine for businesses of all kinds.  Moreover, if Minnesota could provide insulin to its citizens by the simple expedient of appropriating it from manufacturers without compensation, other states could seek to do the same with respect to a broad range of other goods that may serve any manner of policy goals held by those states.  Indeed, the Act would provide a ready-made template for doing so.  Given the obvious incentives for states to find ways to provide benefits for their citizens *without* paying for them, this Court's application of the *per se* takings rule to Minnesota's Act will also ensure that other jurisdictions do not target businesses across countless industry sectors for uncompensated appropriations of the goods they produce.

3.    The District Court improperly dismissed PhRMA's complaint on threshold procedural grounds.  The District Court's procedural holding leaves not just PhRMA and its members, but businesses across the country, in an untenable situation.  The District Court's threshold dismissal not only postponed judicial resolution of the question whether the Act effects *per se* physical takings (which it does, under squarely controlling Supreme Court precedent), but also created a Kafkaesque procedural loophole that would allow states to continuously and physically take manufacturers' property without an adequate remedy.  The District Court's reliance on *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), was

misplaced.  *Knick* clarified and reinforced the bedrock rule that injunctive relief is not available where there is a complete and adequate legal remedy.  That principle forecloses injunctive relief in traditional takings contexts—*e.g.*, where the government takes discrete parcels of land or easements for an infrastructure project or development plan.  But it does not and cannot extend to the special circumstances of this case, which involves a statute that effects an ongoing, continuous, and indefinite series of physical takings of fungible goods.  Extending *Knick* to such circumstances makes a mockery of property rights and would allow states to use burdensome procedural rules to avoid their duty to pay property owners just compensation.

## ARGUMENT

### I.    The Act Is Unconstitutional Under The *Per Se* Takings Doctrine.

#### A.    The *Per Se* Takings Rule Is An Important Bulwark For Private Property Rights.

When it comes to property rights, "predictability and stability are of prime importance."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 (1994); *see also* Roscoe Pound, *Interpretations of Legal History* 154 (Peter Smith 1967) (1923) ("In matters of property and commercial law," "security of acquisitions and security of transactions" have "controlling" importance).  The special importance of predictability and stability, though applicable to property and commercial law in general, has particular force in the area of takings law:  property owners can only

rely on the bedrock constitutional guarantee of just compensation for involuntary takings if there is doctrinal clarity about what constitutes a "taking" in the first place.

This case concerns one of the most important bulwarks of clarity and stability in takings jurisprudence:  the *per se* takings rule articulated in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), and recently reaffirmed and clarified in *Horne v. Department of Agriculture*, 576 U.S. 350 (2015).  Under the *per se* takings rule, the government has a "categorical duty to pay just compensation" for "physical taking[s] of property," *i.e.*, "direct appropriations" where property is "actually occupied or taken away." *Id.* at 358, 361-62.  Although this rule has its origins in much older case law, *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (canvassing prior cases), the Supreme Court emphatically rearticulated and reaffirmed it in *Horne*, notably clarifying that the *per se* takings rule is "equally applicable" to both real and personal property.  *Horne*, 576 U.S. at 360.

The *per se* takings rule is a "fundamental" "guide[] . . . in [the Supreme Court's] Takings Clause jurisprudence." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012).  Crucially, the rule provides a bedrock of clarity for property owners, standing as one of the "few invariable rules" that the Supreme Court has recognized under the Takings Clause. *Id.* at 31.  Outside the context of the bright-line *per se* takings rule, "most takings claims turn on situation-specific

factual inquiries," *id.* at 32, typically governed by the "essentially ad hoc" balancing test articulated and applied in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978); *see also E. Enters. v. Apfel*, 524 U.S. 498, 523-24 (1998) (plurality opinion). By design and practical effect, that balancing test—used to identify so-called "regulatory takings" that, despite not constituting *per se* takings, restrict the use of private property so severely that they nonetheless must be recognized as compensable takings—requires courts to undertake "complex factual assessments of the purposes and economic effects of government actions," *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992).

The fact-specific balancing approach applicable to government actions that fall short of *per se* takings stems from the pragmatic concern that subjecting "regulations prohibiting private uses [of property]" to a categorical takings rule "would transform government regulation into a luxury few governments could afford." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323-24 (2002). But the regulatory takings test has, in practice, become famously hard to implement. Due to the vagueness inherent in the balancing approach used for regulatory takings, "[c]ases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law." *Apfel*, 524 U.S. at 541 (Kennedy, J., concurring in the judgment and dissenting in part). And whatever the merits of such an approach in applying the Takings

Clause to regulations that merely affect the *use* of property, it gives "little insight into when, and under what circumstances" government action will be recognized as a compensable taking. *Lucas*, 505 U.S. at 1015. This "ad hoc balancing" yields "special difficulties in the takings area because of the important role of investment-backed expectations" in a system of commerce based on private property. Susan Rose-Ackerman, *Against Ad Hocery: A Comment on Michelman*, 88 Colum. L. Rev. 1697, 1697 (1988).

By contrast, the duty of governments to pay just compensation for any and all *per se* takings remains a "clear rule," *Yee*, 503 U.S. at 522-23, and a "ray of light in the otherwise shadowy area of takings law," Steven N. Berger, Note, *Access for CATV Meets the Taking Clause: The Per Se Takings Rule of* Loretto v. Teleprompter Manhattan CATV Corp., 25 Ariz. L. Rev. 689, 703 (1983) (internal quotation marks omitted). As a result of its clarity and firmness, the *per se* takings rule allows property owners to make investments based on concrete expectations about the risk of government interference. Owners are secure in the knowledge that *any* physical occupation or appropriation of their property by the government is a compensable taking—regardless of its scope or extent, *see Loretto*, 458 U.S. at 438 n.16, and "no matter how weighty the public purpose behind it," *Lucas*, 505 U.S. at 1015. Property owners can therefore "confidently . . . commit resources to capital projects," assured that the fruits of their investments will not be subject to uncompensated

appropriation by the government. Rose-Ackerman, 88 Colum. L. Rev. at 1700. Maintaining the coherence and vitality of the *per se* takings rule is accordingly crucial to ensuring that takings jurisprudence retains a clear, predictable core that protects investment-backed expectations and allows private enterprise to flourish.

B. The Act Is Flatly Unconstitutional Under *Horne*'s Bright-Line *Per Se* Takings Rule.

Minnesota's legal stance—that the Act does not result in takings of PhRMA's members' property—is foreclosed by *Horne*. *See* PhRMA Br. 50-51. Minnesota disputes that the Act will result in takings even though the Act by its terms requires manufacturers to relinquish ownership of their goods to individuals meeting certain qualifications, without any statutory provision for compensation. That extreme stance improperly ignores—and, if accepted by courts, would contradict—binding Supreme Court precedent, including *Horne*. Minnesota inappropriately seeks to muddy the salutary *per se* takings rule, ignoring the benefits of clarity and stability that rule provides to all property owners. There is no way to distinguish the Act from the government program at issue in *Horne*, and numerous other laws that historically have presented no less a threat to private property rights, without ignoring binding precedent and doing serious violence to the bright-line *per se* takings rule. This, in turn, undermines the most important benefit that rule provides: its predictability, clarity, and stability.

This case is on all fours with *Horne*. In *Horne*, the federal government required raisin growers "to give a percentage of their crop to the Government, free of charge," according to allocations "determined by the Raisin Administrative Committee." 576 U.S. at 354. Raisin growers challenged this scheme as a *per se* taking without just compensation. The Court agreed, holding that the government's program effected a "clear physical taking" because "[a]ctual raisins are transferred from the growers to the Government," and growers "los[t] the entire 'bundle' of property rights in the appropriated raisins." *Id.* at 361.[2] The Court rejected the argument that the government's mandate to "relinquish specific, identifiable property" was a constitutionally permissible "condition" on "participat[ing] in the raisin market." *Id.* at 364-65. And the Court rejected the suggestion that there was no taking simply because, in theory, the Government could achieve similar ends by different means, such as "a regulatory limit on production": as the Court explained, "[t]he Constitution . . . is concerned with means as well as ends." *Id.* at 362.

As PhRMA explains, the Act is a taking under the holding and rationale of *Horne*. PhRMA Br. 50-51. In addition, it bears keeping in mind the broader doctrinal—and, for American businesses, practical—implications of any contrary

---

[2] In fact, *Horne* involved a wrinkle *not* present here—namely, that the raisin growers (unlike insulin manufacturers under the Act) retained a theoretical "interest in any net proceeds from sales" of the appropriated goods by the government. *Horne*, 576 U.S. at 355. In that respect, Minnesota's Act presents an even starker example of a *per se* taking than *Horne*.

holding. This case, like *Horne*, involves an actual state-mandated transfer of physical goods without compensation. Manufacturers "lose the entire 'bundle' of property rights in the appropriated" products. *Horne*, 576 U.S. at 361. Those who do not comply are subject to severe monetary sanctions. *Compare* PhRMA Br. 12, *with Horne*, 576 U.S. at 356 (discussing civil penalties imposed on non-complying raisin growers).

Nor does it matter that this case, unlike *Horne*, involves a transfer of property to other private parties rather than the state itself, or that (under one of the Act's two programs) manufacturers have the "option" to reimburse pharmacies rather than supplying physical insulin. *Cf.* PhRMA Br. 51, 53-54. While the Constitution allows government-mandated transfers of property from one private owner to another, *see Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 657-58 (1890), such transfers *remain takings*, triggering the same constitutional duty to "mak[e] just compensation to the owner"; *see also Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 245 (1984). And a state cannot nullify the Takings Clause by giving property owners the "option" to pay the state for the privilege of not being subjected to uncompensated *per se* physical takings. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 611-12 (2013).

In short, the Act falls squarely within the *per se* takings rule and is unconstitutional under *Horne*. Any conceivable distinctions that the state may

offer—whether grounded in the nature of the product, the purpose of the legislation, or the details of the "conditions" that must be satisfied to trigger the obligation to surrender goods—are irrelevant under *Horne*'s holding and rationale. The dispositive fact is that the Act "actually takes title" away from property owners, *Yee*, 503 U.S. at 522—*i.e.*, "seizes or does the equivalent of seizing the property" and gives it to others, *Store Safe Redlands Assocs. v. United States*, 35 Fed. Cl. 726, 728 (1996). "[E]very possible element of a Fifth Amendment 'taking'" is present, with the manufacturers losing any interest in the goods they are required to relinquish— "not because their property vanished into thin air," but because Minnesota has required them to turn it over "for [the public] advantage." *Armstrong v. United States*, 364 U.S. 40, 48 (1960).

This Court should accordingly not only reverse the District Court's holding on standing, but also address the substantive constitutional issue at the heart of this case and hold that the Act effects *per se* takings without just compensation. Failure to reach the merits would unnecessarily prolong Minnesota's defiance of the Supreme Court's holding that there is a "categorical duty" to pay just compensation in such circumstances. *Horne*, 576 U.S. at 358. This Court should not leave businesses and other property owners in limbo by allowing Minnesota to further delay judicial rejection of its novel attempt to undermine the *per se* takings doctrine,

with respect to a state law that is flatly unconstitutional under controlling Supreme Court precedent.

## II. The State's Rationale For Defending The Act Would Impermissibly Allow States To Take Private Property In A Broad Range Of Contexts.

Minnesota's attempt to avoid its duties under the Takings Clause threatens the private property rights of businesses, and especially manufacturers, in a broad range of contexts. No matter how laudable the Act's goal—which Minnesota could have accomplished through any number of constitutionally sound mechanisms—"[t]he Constitution . . . is concerned with means as well as ends." *Horne*, 576 U.S. at 362. Leaving in place Minnesota's attempt to seize PhRMA's members' products without just compensation would threaten the property rights of manufacturers and other businesses across virtually every industry sector. The important issue of federal takings law at the heart of this case should not be left open pending remand to the District Court or the future initiation of numerous inverse condemnation lawsuits in Minnesota state court. The Supreme Court has repeatedly articulated and enforced the *per se* takings rule of *Loretto* and *Horne*; this Court should apply that well-settled law here and now. Unless and until there is a binding judicial determination that the Act unlawfully takes property without just compensation, Minnesota's example will encourage other states to reframe traditional "takings" in an effort to avoid paying compensation, improperly attempting to force "some people alone to bear public

burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

Federal and state case reporters are replete with examples of government appropriation or occupation of personal property, highlighting the important and continuing role of the *per se* takings rule in protecting property rights beyond the real-property context. For example, in *Milwaukee & Suburban Transport Corp. v. Milwaukee County*, 263 N.W.2d 503, 508 (Wis. 1978), Milwaukee County condemned the assets of a private bus system and began operating the system under public ownership; all parties agreed that just compensation was required, and the only dispute was the exact amount. In *Lee v. City of Chicago*, 330 F.3d 456, 458-59 (7th Cir. 2003), police impounded an innocent bystander's private vehicle for investigation and spray-painted large inventory numbers on it.[3] Similarly, the plaintiff in *Innovair Aviation, Ltd. v. United States*, 72 Fed. Cl. 415 (2006), *rev'd on other grounds*, 632 F.3d 1336 (Fed. Cir. 2011), was completing the turboprop conversion of certain airplanes that were under contract to Air Colombia when the government seized the planes, claiming Air Colombia was a front for drug cartels; the court held that the seizure was a *per se* taking of the plaintiff's property. 72 Fed.

---

[3] Although the case was not litigated on takings grounds, Judge Wood concluded that the plaintiff had "suffered [a] . . . taking: governmental authorities physically took some of his personal property for a public purpose and kept it for a period of time." *Lee*, 330 F.3d at 474 (Wood, J., concurring).

Cl. at 416-18, 422. These are not isolated examples; indeed, reported cases involving commandeering of vehicles by government authorities go back to the Civil War: in *United States v. Russell*, 80 U.S. 623 (1871), "[t]hree steamboats . . . were impressed into the public service and employed as transports for carrying government freight," *id.* at 628-29.

Other cases have involved everything from business equipment to household goods. In *United States v. General Motors Corp.*, 323 U.S. 373, 381, 383-84 (1945), the Supreme Court held that business equipment destroyed or depreciated as part of a temporary government takeover of a General Motors warehouse in Chicago triggered a duty of just compensation. In *Seery v. United States*, 161 F. Supp. 395 (Ct. Cl. 1958), the United States took a variety of household goods when the Army commandeered an opera singer's "castle-like villa" as an officers' rest home during and after World War II—again triggering a duty of just compensation for such *per se* takings, *id.* at 396-97, 399.

And in *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992), the D.C. Circuit agreed with former President Richard Nixon that a law depriving him of control over his presidential papers (albeit providing for the return of papers lacking "general historical significance," *id.* at 1272) was a *per se*, compensable taking— because it "physically dispossessed" him of the papers and foreclosed "his right to exclude others" and "dispose of the property" as he wished, *id.* at 1287. The

diversity of reported cases illustrates the nearly limitless range of situations in which the government may seek to appropriate private property for public use—and demonstrates the importance of reinforcing and reaffirming the clear *per se* takings rule that provides assurance to all property owners that their goods will not be taken without just compensation.

There can be no doubt that, under the state's (incorrect) view of takings doctrine, other governments would rationally respond by enacting laws or restructuring existing ones to avoid their duties under the Takings Clause. For example, a local government seeking to make a privately operated bus system more accessible (*cf. Milwaukee Cty.*, 263 N.W.2d 503) might simply require the bus operator to surrender tickets for distribution to individuals meeting certain criteria, rather than running a subsidy program out of public funds. Similarly, the program challenged in *Horne* could be restructured to look more like Minnesota's Act—*e.g.*, by requiring growers to set up and administer programs for giving raisins directly to "exporters," "foreign governments," "charitable causes," or other growers according to certain defined formulae, rather than (as actually occurred) requiring the growers to surrender the raisins to a government entity for similar uses. *Horne*, 576 U.S. at 354. Under Minnesota's view of the law, even takings of "vehicles, food, . . . and supplies" of the sort that "likely . . . led to the Takings Clause" might be achieved without compensation by requiring manufacturers to administer programs to provide

such goods to state employees in defined circumstances.  Michael W. McConnell, *The Raisin Case*, 2015 Cato Sup. Ct. Rev. 313, 323 (2015); *see also Horne*, 576 U.S. at 358-59 (describing origins of Takings Clause).

The risk of creating such bad incentives is particularly acute because the Act is, at bottom, a *de facto* safety net program with the basic goal of providing goods to individuals who may otherwise have difficulty paying for them.  *See* McConnell, 2015 Cato Sup. Ct. Rev. at 320 (noting that "government is more likely to invade property rights if it thereby gains control over valuable resources that can be redistributed," as opposed to "value-destroying" takings where property is damaged or otherwise rendered inherently less valuable).  The *per se* takings doctrine does and must apply with no less force to laws of this nature.

Typically, and appropriately, state programs designed to make goods available to citizens at reduced or no cost are paid for through public funds—whether the state buys goods and distributes them itself, reimburses private individuals' purchases, or uses a system of tax credits.  The *per se* takings doctrine ensures this outcome, imposing a legal duty of just compensation that effectively requires states to "buy" the goods in question (albeit not necessarily in a voluntary exchange).[4]  But

---

[4] In economic terms, a system that gives governments eminent domain power but requires them to pay just compensation (defined as market price) differs from a normal private market only by allowing governments to "force a sale."  *See, e.g.*, Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and*

states naturally have incentives—financial, political, or otherwise—to avoid bearing the costs of such public programs, or to disguise their true costs to the public. *See* Truth in Accounting, *Financial State of the States 2020* at 4, 21 (Sept. 22, 2020), https://bit.ly/2FOaFwR (finding that "39 states d[o] not have enough money to pay all of their bills," with "total debt of the 50 states amount[ing] to $1.4 trillion").

Indeed, if the Act is not promptly and authoritatively held to effect *per se* takings, states will be encouraged to restructure other state programs—essentially, any program designed to make goods available to citizens at zero or reduced cost—in a way that allows the state to avoid, or at least appear to avoid, the costs by simply appropriating goods from the companies that make them.[5] For example, Minnesota and other states could conclude that instead of using public money to fund assistance programs for food, school supplies, or solar panels,[6] it would be more expedient to

---

*Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089, 1093, 1108, 1110 (1972).

[5] Needless to say, states' cost-shifting strategies may have unintended consequences on supply and pricing that could defeat any effort to impose the full cost on manufacturers in the long-term. *See generally* Fiona M. Scott Morton, *The Problems of Price Controls*, Regulation, Spring 2001, at 50, https://bit.ly/3i19Z4a.

[6] *See, e.g.*, Minn. Dep't of Human Servs., *Minnesota Food Assistance Program (MFAP)*, https://bit.ly/2EzTO06 (last visited May 17, 2021) (describing Minnesota program for food benefits for certain individuals not eligible for Supplemental Nutrition Assistance Program); Jennifer Gish, *$200 State Grants for School Supplies*, Times Union (Aug. 12, 2009), https://bit.ly/3kMQbDu (describing New York "state's new program" to provide funds for books, calculators, clothes, and other school supplies); Solar Energy Indus. Ass'n, *What Rebates and Incentives Are*

require companies that produce these items to give them away for free according to a defined formula or procedure. Similarly, instead of buying books and computers for public libraries out of public funds, a state could simply require book publishers and computer manufacturers that sell their products within that state to provide a certain number of free copies of each new book title or computer model. And, as the example of books and computers illustrates, states could attempt to undermine federal patent and copyright law (which would preempt direct state-level price-setting, *see Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1374 (Fed. Cir. 2007); *Se. Pa. Transp. Auth. v. Gilead Sci., Inc.*, 102 F. Supp. 3d 688, 702-03 (E.D. Pa. 2015)), by forcing makers of copyrighted or patented items to give away a certain amount without any compensation.[7]

Such laws might or might not result in desirable outcomes in individual cases from a policy perspective. But they are not what the Constitution contemplates or permits. "[I]t is fundamental that the Constitution requires compensation even where the conversion of private property for public use is based on a weighty public interest." *Nixon*, 978 F.2d at 1275; *see id.* at 1284 (similar). Simply put, this Act requires manufacturers to give away their products without compensation, and it is

_____

*Available for Solar Energy?*, https://bit.ly/3mRhxu0 (last visited May 17, 2021) ("[M]any states . . . offer rebates or other incentives for solar energy technologies.").

[7] Indeed, the Act here achieves exactly that practical outcome with respect to patented insulin products.

unconstitutional for that reason. Any delay in a ruling to that effect will undermine the security of property rights not just for insulin manufacturers, but for businesses across every industry sector.

## III. The District Court's Procedural Holding Was Wrong.

The District Court avoided reaching the constitutional merits by dismissing PhRMA's complaint on procedural grounds. In summary fashion, the District Court concluded that PhRMA could not seek injunctive or declaratory relief because, in its view, inverse condemnation actions in Minnesota state court provide an adequate remedy at law. *See* PhRMA Br. 16-17. That conclusion was erroneous—and deeply threatening to manufacturers and other businesses across the country. It would, if affirmed, convert takings law into an unfair procedural game of "catch me if you can."

The District Court relied (*see* PhRMA Br. 17) on *Knick* for the proposition that "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." 139 S. Ct. at 2176. Under that rule, "equitable relief is generally unavailable" to property owners threatened with uncompensated takings because "the federal and nearly all state governments provide just compensation remedies to property owners." *Id.* That holding follows from the broader principle that injunctive relief is unavailable where there is an adequate remedy at law, which forecloses equitable remedies in the great

majority of takings cases. *Id.* at 2175-77. But it is not an absolute bar. As the Court explained, "equitable relief is *generally* unavailable" for takings claims because there is generally an "*adequate* provision for obtaining just compensation." *Id.* at 2176 (emphasis added). The District Court pressed this general rule beyond its limits, applying it to foreclose injunctive relief in the unusual circumstances of this case. Here, no adequate legal remedy exists given the continuous and ongoing nature of the takings; new takings occur indefinitely for as long as the Act is in force.

Minnesota's Act is not akin to the familiar varieties of government takings covered by *Knick*. The mine-run of takings cases involve essentially "one-off" takings of real-property interests that are needed to construct infrastructure (like a railroad or utility line) or for some other public development project. *See, e.g.*, *Cherokee Nation*, 135 U.S. at 642-43 (railroad, telephone, and telegraph lines); *Kelo v. City of New London*, 545 U.S. 469, 473-75 (2005) (government-sponsored development plan). An ordinary condemnation action offers an adequate remedy in such cases because it provides a clean, efficient, and straightforward mechanism for settling the matter in a single proceeding: the amount of just compensation is determined (with the property owner given an opportunity to litigate the amount if

the matter is disputed), the property owner receives the money to which it is entitled, and there are generally no further takings or proceedings contemplated.[8]

Even beyond this familiar core of "textbook" government takings, an ordinary condemnation action or an inverse condemnation lawsuit generally provides an adequate remedy—again, because most takings are a one-time matter. For example, the government might requisition real or personal property during a war—*e.g.*, seizing control of an industrial facility or commandeering private ships. *See, e.g.*, *Gen. Motors*, 323 U.S. at 375; *Russell*, 80 U.S. at 628-29. Even if extreme emergency circumstances make it impossible to proceed through formal condemnation actions initiated by the government, *but cf.* PhRMA Br. 42 & n.10 (noting that government typically still pays for goods in advance during national emergencies), an inverse condemnation action filed by the property owner can provide an adequate remedy because the taking is a discrete occurrence that can be appropriately addressed through a retrospective award of compensation.

This case is entirely different. The Act does not authorize a one-time seizure of manufacturing facilities or a one-time requisitioning of inventory. It mandates an

---

[8] To be sure, infrastructure or development projects may involve taking property from multiple property owners in sequence. But each *individual* owner is usually affected just once. Even where one property owner has multiple parcels taken as part of a single government development plan, this would bear no resemblance to the situation that PhRMA's members face here: a *constant* and *indefinite* sequence of new takings directed at the same property owner for the foreseeable future, with no determinate endpoint.

*endless* and *constant* process of piecemeal takings by forcing pharmaceutical manufacturers to give away their products to an indefinite class of qualifying individuals. As a result, inverse condemnation actions do not provide an adequate remedy. Pharmaceutical manufacturers cannot file inverse condemnation actions for prospective takings that will occur over the life of the Act. *See* PhRMA Br. 3-4, 18. And even if compensation for future takings were procedurally available, it would be impossible to predict the *amount* of insulin that Minnesota will take in the future, and therefore impossible to settle on a correct sum to be paid in compensation. Nor would it be practical for PhRMA's members to wait for some indeterminate point in time when the individual takings appear to be finished (assuming the statute of limitations has not run), and then file an inverse condemnation action seeking aggregate compensation for the whole amount. Even if they attempted to predict when the state's takings were over, they would inevitably experience additional takings that require even more inverse condemnation actions down the road.

The only option is for PhRMA's members to repeatedly file inverse condemnation actions in Minnesota state court for the indefinite future—say, one lawsuit filed by each manufacturer each month, endlessly, leading to a nonstop churn of litigation for the lifetime of the Act. The absurdity of this approach speaks for itself, as does its practical inadequacy. There is nothing "adequate" about using burdensome state-court lawsuits, with all the attendant expense and inconvenience,

as the world's least efficient mechanism for sending regular periodic billing invoices.

The District Court rested its conclusion on an apparent absence of similar cases arising in the past. *See* PhRMA Br. 17. But a mere absence of directly on-point precedent only reflects the egregiously unconstitutional nature of the state law here. Certainly, it is not an excuse for blessing a Kafkaesque "'sue me' approach to the Takings Clause" that would impose extraordinary and untenable administrative burdens on insulin manufacturers, extending indefinitely into the future. *Knick*, 139 S. Ct. at 2180 (Thomas, J., concurring).

The District Court's procedural holding, if allowed to stand, would cause many of the same problems for manufacturers and businesses nationwide as a substantive holding in Minnesota's favor on the underlying Fifth Amendment issues. As described in Parts I and II above, the Act clearly effects *per se* physical takings. If Minnesota can avoid paying just compensation for physically taking manufacturers' property, other states will be incentivized to follow suit with similar laws, threatening property owners nationwide. The same is true if states know that they can simply impose burdensome procedural barriers that make it difficult, if not impossible, for businesses to effectively collect sums to which they are constitutionally entitled. *Accord* PhRMA Br. 42. Unfortunately, that is the message the District Court's procedural decision sends—both to states and to property

owners.  Here, reaffirming the practical vitality of the *per se* takings doctrine also requires reversing the District Court's procedural determination.

## CONCLUSION

This Court should reverse the District Court's decision, reach the constitutional merits, and hold that the Act effects *per se* takings without just compensation.

Date:  May 28, 2021

Respectfully submitted,

*/s/ Jeremy C. Marwell*

Patrick Hedren
Erica Klenicki
Manufacturers' Center
   for Legal Action
733 Tenth Street, NW
Suite 700
Washington, DC  20001
Phone: (202) 637-3100

Jeremy C. Marwell
Matthew X. Etchemendy
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone:  (202) 639-6507
Email: jmarwell@velaw.com
Email: metchemendy@velaw.com

*Counsel for the National*
*Association of Manufacturers*

*Counsel for* Amici Curiae

Tara S. Morrissey
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC  20062
Phone:  (202) 463-5337

*Counsel for the Chamber of*
*Commerce of the United States of*
*America*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the word count limitations set forth in Fed. R. App. P. 29(a)(5) because it contains 6,109 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

3.      In accordance with 8th Cir. R. 28A(h), I certify that this brief has been scanned for viruses and is virus-free.


DATED:  May 28, 2021          */s/ Jeremy C. Marwell*
                              Jeremy C. Marwell
                              Vinson & Elkins LLP
                              2200 Pennsylvania Avenue, NW
                              Suite 500 West
                              Washington, DC  20037
                              Phone: (202) 639-6507
                              Email: jmarwell@velaw.com

                              *Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on May 28, 2021, I electronically filed the foregoing *Brief of the National Association of Manufacturers and the Chamber of Commerce of the United States of America as* Amici Curiae *in Support of Plaintiff-Appellant and Reversal* with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: (202) 639-6507
Email: jmarwell@velaw.com

*Counsel for* Amici Curiae